**Walter BELL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71843.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 20, 1996.

Rehearing Denied Feb. 5, 1997.

---

Douglas M. Barlow, Beaumont, for appellant.

John R. Dewitt, Assistant District Attorney, Beaumont, Matthew Paul, State's Attorney, Austin, for appellee.

## OPINION

### PER CURIAM.

In March 1994 a jury convicted appellant of capital murder under Texas Penal Code § 19.03(a)(2). The offense, murder in the course of robbery or attempted robbery, was committed on July 19, 1974. At the punishment phase of the trial, the jury affirmatively answered the special issues submitted under Texas Code of Criminal Procedure Article 37.0711 §§ 3(b)(1) and (2),[1] and negatively answered the special issue prescribed by Article 37.0711 § 3(e).[2] The trial court accordingly sentenced appellant to death. Article 37.0711 § 3(g). Under Article 37.0711 § 3(j), direct appeal to this Court is automatic. Appellant raises twenty-seven points of error. We will affirm.

A brief history of the case is helpful. Appellant was indicted separately in 1974 for the capital murders of Irene and Ferd Chisum, and was first tried, convicted, and sentenced to death for Irene's murder. We affirmed that conviction in *Bell v. State*, 582 S.W.2d 800 (Tex.Cr.App.1979), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981).[3] In 1982, appellant was convicted for the capital murder of Ferd Chisum and received a death sentence which we affirmed in *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App. 1986), *cert. denied*, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). On habeas review, this Court in 1991 reversed appellant's conviction and sentence pursuant to *Penry v. Lynaugh* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (reversing Penry's sentence because Texas's capital sentencing statute did not provide vehicle for jury to consider mental retardation evidence as mitigating against imposition of death penalty). Ex parte Bell, No. 70,946 (Tex.Cr.App. November 6, 1991) (not designated for publication).[4] This is an appeal of appellant's second conviction and death sentence for the capital murder of Ferd Chisum.

### Sufficiency of the Evidence at Punishment

█ Although appellant does not contest the sufficiency of the evidence to establish his guilt, he disputes the sufficiency of the evidence supporting his death sentence. In his eighth point of error, appellant contends that the evidence was insufficient to sustain a finding of future dangerousness under Article 37.0711 § 3(b)(2).[5] We disagree.

█ In reviewing the sufficiency of the evidence at the punishment phase, we view the evidence in the light most favorable to the jury's finding and determine whether any rational trier of fact could have made the finding beyond a reasonable doubt. *Moreno v. State*, 858 S.W.2d 453, 457 (Tex.Cr.App.), *cert. denied*, 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993). In our evaluation, we are mindful that the circumstances of the offense and the events surrounding it can be among the most revealing evidence of future dangerousness and alone may be sufficient to

1. Article 37.0711, § 1 provides:

 This article applies to the sentencing procedure in a capital case for an offense that is committed before September 1, 1991, whether the sentencing procedure is part of the original trial of the offense, an award of a new trial for both the guilt or innocence stage and the punishment stage of the trial, or an award of a new trial only for the punishment stage of the trial. For the purposes of this section, an offense is committed before September 1, 1991, if every element of the offense occurs before that date.

2. Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

3. In 1984 appellant's death sentence was commuted to life imprisonment after a federal district judge determined that appellant had not been adequately warned of his rights during an interview with a psychiatrist who testified during his 1974 trial.

4. Although we reversed because of punishment error only, appellant's conviction was reversed as well under the former version of Article 44.251.

5. Specifically, Article 37.0711 § 3(b)(2) instructs the jury at punishment to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]"

support an affirmative answer to that special issue.[6] *Id.* at 457, 459.

Viewed in the light most favorable to the jury's verdict, the evidence at guilt-innocence showed the following: Appellant worked at the Chisums' appliance repair business and had been fired approximately a week before the offense. After he was fired, appellant planned to attack and rob the Chisums at their home. In preparation for his crime, appellant assembled an "equipment kit" consisting of a sharpened knife, handcuffs, an electrical cord with the ends cut off, and some documents, and placed these items inside a bag. Appellant gained entry into the Chisums' home under the pretext of asking Mr. Chisum's help in applying to mechanic's school and used the papers he brought to support his ruse. At the end of the conversation, appellant pulled the knife on Mr. Chisum, handcuffed him, and bound his feet together with the extension cord. Appellant then called Mrs. Chisum into the room and tied her legs and hands with pieces of towel. After forcing Mr. Chisum to hop from the living room into a closet, appellant took Mrs. Chisum into the study. When Mr. Chisum escaped from the closet, appellant chased him down, beat him, and stabbed him in the chest. After returning to the study, appellant untied Mrs. Chisum, forced her to undress, gagged her with a towel, and raped her. Afterwards, he forced her to write out some checks to appellant under an alias. When Mrs. Chisum began making mistakes due to her nervousness, appellant grabbed a pillow and slashed it to show her that he was serious. After Mrs. Chisum signed the last check, appellant choked her to death with a towel and moved her body into a bathtub. He returned to Mr. Chisum, choked him, and dragged him to the bathtub.

Appellant left the Chisums' house with some cash and the victims' watches, among other items. The next day, appellant bought some clothes, got a haircut, attempted to cash one of the checks, played pool, and drank beer. Appellant was arrested later that evening and signed a confession describing the details of the offense that was admitted into evidence at his trial.[7]

At punishment, the State relied heavily on the facts of the offense to show future dangerousness. In addition, the State introduced evidence of two extraneous acts involving threats of violence. First, according to a prison disciplinary report from 1981, appellant told a prison guard who was strip searching him, "Don't look at me like this you mother fucker, next time you do this I'll cut your throat and any other peckerwood's throat that tries to strip me." Second, according to military records from appellant's service in the navy, he was court-martialed in 1973 for telling a corporal, "Shut your mouth or I'm going to kill your ass."

■ In our affirmance of appellant's first conviction for Ferd Chisum's capital murder, we also reviewed the sufficiency of the evidence to support the jury's future dangerousness finding. *Bell*, 724 S.W.2d at 803–804. While we acknowledge that the "law of the case" doctrine does not apply to an evidentia-

---

6. Other factors which a jury is entitled to consider when determining whether a defendant will pose a continuing threat to society include (1) the calculated nature of the defendant's acts; (2) the forethought and deliberateness exhibited by the crime's execution; (3) the existence of a prior criminal record, and the severity of the prior crimes; (4) the defendant's age and personal circumstances at the time of the offense; (5) whether the defendant was acting under duress or the domination of another at the time of the offense; (6) psychiatric evidence; and (7) character evidence. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr.App.1987).

7. In his confession, appellant implicated a second party, Sheppard Watson, who was also indicted for capital murder. However, the indict-

ment against Watson was dismissed after police decided there was no evidence to corroborate his confession. Other than appellant's confession, the evidence connecting Watson to the crime consisted of testimony that Watson at one point was wearing a shirt with bloodstains on it, and a bank employee's identification of Watson from a line-up as an individual who was with appellant when he attempted to cash Mrs. Chisum's check at the bank. The jury was free to disbelieve appellant's contention that Watson was involved in the murders. Moreover, even if the jury were to have believed that Watson had been involved in some way, there was no evidence that appellant was acting under the domination or direction of Watson.

ry sufficiency challenge,[8] we note that the aggravating evidence in both of appellant's trials was virtually identical. In *Bell* we looked at the same aggravating facts that were present in the instant case and commented that the facts of the offense alone "indicate[d] a propensity, perhaps even an appetite, for violence." *Id.* We held, "Considering this evidence alone, without the threats presented by the State in the punishment stage, we find sufficient support for the jury's affirmative finding to Special Issue Two." *Id.* Because the aggravating facts in both trials were basically identical, we see no reason to come to a different conclusion regarding the sufficiency of the evidence to support the jury's finding of future dangerousness. We cannot say the jury was irrational in believing appellant would commit criminal acts of violence which would constitute a continuing threat to society, and hold that the evidence was sufficient to support the jury's affirmative answer to the future dangerousness special issue. Appellant's eighth point of error is overruled.

 In his ninth point of error, appellant argues that the evidence is insufficient to support the jury's negative answer to the mitigation special issue under Article 37.0711 § 2(e).[9] In support of his contention, appellant points to his youth at the time of the offense,[10] his exemplary conduct in prison over the last two decades,[11] and his mental retardation.[12] Appellant first urges this Court to "engage in a *de novo* review of both the existence and the respective weight of aggravating and mitigating circumstances." [13] In the alternative, appellant continues, this Court should determine whether the jury's verdict was against the great weight and preponderance of the evidence. *Cf. Meraz v. State,* 785 S.W.2d 146, 155 (Tex.Cr.App.1990) (defendant has burden of proving affirmative defense of insanity and appellate review should inquire whether verdict was against the great weight and preponderance of the evidence).

In *McFarland v. State,* 928 S.W.2d 482 (Tex.Cr.App.1996), we held that appellate review of the jury's answer to the mitigation special issue is not constitutionally required. *Id.,* at 499. We explained that we cannot review the jury's answer to the mitigation special issue, either in an independent *de novo* review,[14] or in a review of factual sufficiency, because it is a subjective determina-

8. *Alexander v. State,* 866 S.W.2d 1, 2–3 (Tex.Cr.App.1993), *cert. denied,* 511 U.S. 1100, 114 S.Ct. 1869, 128 L.Ed.2d 490 (1994).

9. Article 37.0711 § 2(e) states:

> The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

10. Appellant was twenty years old at the time of the murders.

11. At the punishment stage, appellant presented testimony from three death row prison guards and three religious advisors, all of whom asked the jury not to impose the death penalty and testified that appellant was an exceptionally well-behaved, non-threatening prisoner.

12. Appellant's I.Q. has been tested at various times, with scores ranging from 54, which was taken when appellant was nine years old, to a 1994 score of 69.

13. To the extent that appellant asks this Court to balance mitigating and aggravating factors, we note that the Supreme Court has held that the federal constitution does not require a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding. *Franklin v. Lynaugh,* 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988) (plurality opinion). The Supreme Court has also held that the Eighth Amendment does not require states to assign any specific weight to any particular factors to be considered by the jury, either aggravating or mitigating. *Harris v. Alabama,* 513 U.S. 504, ──, 115 S.Ct. 1031, 1035, 130 L.Ed.2d 1004 (1995). It follows that the Texas scheme, which allows the jury to determine the weight of mitigating evidence, is not unconstitutional.

14. If we were to conduct an independent *de novo* review of the mitigating evidence, the jury's answer to the mitigation special issue would be rendered merely advisory. This approach would conflict with our usual practice of deferring to the jury's findings at the punishment phase of a capital trial. *McFarland,* supra, at 499. *See also Burns v. State,* 761 S.W.2d 353, 355–356, n. 4 (Tex.Cr.App.1988).

tion left exclusively to the jury. *Id.,* at 498. *See also Colella v. State,* 915 S.W.2d 834, 845 (Tex.Cr.App.1995) (holding that because jury alone faces the task of evaluating mitigating evidence, we cannot review jury finding that, taking into consideration all evidence, there are no sufficient mitigating circumstances to warrant imposition of life imprisonment rather than the penalty of death). Because appellant raises no new arguments, we overrule his ninth point of error.

■ In points of error ten and eleven, appellant agrees that meaningful appellate review of the sufficiency of mitigating evidence is impossible; however, he insists that because Article 44.251(a) and the federal constitution require such review, the Texas capital sentencing statute is unconstitutional.[15] First, appellate review of the jury's answer to the mitigation special issue, which is a practical impossibility, is not constitutionally required. *McFarland, supra,* at 499. *See also Burns v. State,* 761 S.W.2d 353, 356, n. 4 (Tex.Cr.App.1988) (citing *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 [1984] for the proposition that "it is doubtful [that] Eighth Amendment or Due Process considerations absolutely require this Court to reweigh punishment evidence ...")). Second, even if Article 44.251(a) were problematic, it would not affect the constitutionality of our capital punishment scheme. *Lawton v. State,* 913 S.W.2d 542, 557 (Tex.Cr.App.1995). So long as the jury is not precluded from hearing and giving effect to mitigating evidence, our capital punishment scheme is constitutional regardless of whether appellate review of the jury's mitigation verdict is possible. *Id.; McFarland,* supra, at 499. Because appellate review of the jury's finding regarding mitigating evidence is neither possible nor constitutionally required, we overrule appellant's tenth and eleventh points of error.

**15.** Article 44.251(a) states:
The court of criminal appeals shall reform a sentence of death to a sentence of confinement in the institutional division of the Texas Department of Criminal Justice for life if the court finds that there is insufficient evidence to support an affirmative answer to an issue submitted to the jury under ... Section 3(b), Article 37.0711, of this code *or a negative answer to*

Pretrial

■ Appellant maintains in his twenty-fifth point of error that the trial court reversibly erred when it denied his motion for change of venue. Appellant's motion and accompanying affidavits allege that appellant could not get a fair trial in Jefferson County because of prejudicial and inflammatory pretrial publicity.

Appellant filed his motion after the jury had been selected. At the venue hearing, appellant introduced copies of over one hundred fifty newspaper articles about appellant and the Chisum murders. All but eight of these appeared between 1974 and 1991. Five articles from 1993 chronicle the District Attorney's decision to retry appellant for Mr. Chisum's murder in the instant case, this Court's refusal to rehear its decision to set aside appellant's 1982 sentence and conviction, and appellant's life on death row. Three articles from 1994 cover jury selection in appellant's current capital murder trial.

Appellant also submitted excerpts from nine television news broadcasts concerning appellant's retrial that aired on February 6, 7, and 8 of 1994.[16] Each segment, ranging from 40 seconds to one minute in length, mentions that appellant was facing his third capital murder trial in connection with the Chisum murders. Six of the broadcasts stated that appellant had received two death sentences which were both overturned, and three news stories attributed the reversals to "technicalities."

At the hearing on his motion, four witnesses testified for appellant in favor of a change of venue. Melvin Boneau, an attorney practicing in Jefferson County, first testified that much of the community knew that appellant had confessed to the Chisum murders and had received the death penalty. Boneau felt that regardless of any instruction

*an issue submitted to a jury under ... Section 3(e), Article 37.0711,* of this code.
(Emphasis added).

**16.** The trial judge instructed the jury panel on February 7 not to read, watch, listen to, or talk about anything regarding appellant's case, outside of hearing the evidence.

from the trial court, a juror from Jefferson County would not be able to put aside his or her knowledge of appellant's prior capital murder convictions. Richard Lewis, a civil attorney practicing in Jefferson County, testified that, based on pretrial publicity and discussions with members of the community, he believed appellant could not receive a fair trial in Jefferson County. Thomas Roebuck, another lawyer practicing in Jefferson County, also testified that he did not think appellant could receive a fair trial in Jefferson County because of pretrial publicity. According to Roebuck, there was a public outcry concerning the length of time appellant's case had been involved in the appellate process. Raymond Scott, a Jefferson County minister and president of a local NAACP chapter, testified that based on conversations with community members and negative media attention, he felt appellant could not receive a fair trial in Jefferson County. Scott also felt "the atmosphere that exists here in Jefferson County is unhealthy for any African American to be in court." [17]

In addition, appellant pointed out to the trial court that out of 60 veniremembers individually interviewed during voir dire, 36 had some knowledge of his case, six of whom were selected to serve on the jury.[18] Of these six, one juror stated she had seen a news report on television the night before her individual voir dire but did not pay attention to it and knew nothing about the facts of this case; one had seen recent newspaper headlines and had heard conversations about appellant and knew this was appellant's third trial, but could disregard that knowledge if selected as a juror; another had heard on a recent television news story that this was appellant's third trial but said he was not influenced by what he had heard; a fourth had heard on a recent television news broadcast only that appellant's capital murder trial was about to begin; a fifth juror recalled hearing about the case years ago and had recently learned from television and newspapers that the case had been overturned, but

had not formed any opinions regarding appellant's guilt or innocence in this case and would not be influenced by information from outside sources. Finally, a sixth juror knew that both of appellant's death sentences had been overturned and knew the reasons for the reversals, but did not have a problem with the reversals because she did not believe that "people get out just on technicalities or loopholes." She further stated that any knowledge she had about appellant's prior convictions and sentences would not influence her if chosen to serve on the jury. None of these jurors was challenged for cause.

Regarding other members of the jury panel who had heard something about the case,[19] appellant does not state whether any of these were biased against him, whether any were challenged, successfully or not, for cause, or if he used any of his peremptory strikes on them. Furthermore, to the extent that appellant asserts prospective jurors felt his death sentences had been overturned because of "technicalities," he provides us with no citations to the record.

In addition to three controverting affidavits, the State offered testimony from one of the affiants, John Appleman, district clerk of Jefferson County. Appleman testified that he was familiar with the publicity surrounding appellant and the Chisum murders and felt that the publicity had been fair and accurate and not inflammatory or prejudicial. Appleman stated that he thought appellant could get a fair trial in Jefferson County, which had a population of 128,980 qualified potential jurors. Yet on cross-examination, Appleman admitted that having a juror with specific knowledge of appellant's case, including knowledge of why both of appellant's death sentences had been overturned, would probably prevent appellant from having a fair trial. He qualified this response under redirect questioning and stated that if such a juror were to swear he or she could be

---

17. Appellant is African–American.

18. Appellant filed his motion for change of venue after the jury had been selected.

19. A review of the approximately 66 jury panel questionnaires included in the record shows that 25 indicated either at least slight familiarity with the facts of the case or some exposure to media coverage.

impartial, any knowledge the juror had would not make a difference.

■ Article 31.03(a)(1) provides that a change of venue may be granted on a defendant's motion if "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial." When outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial. *Henley v. State*, 576 S.W.2d 66, 71 (Tex.Cr.App.1978). The trial court may use voir dire to help gauge the community climate; however, regardless of the successful qualification of a jury panel, the evidence adduced during the venue hearing may show that a change of venue is necessary to assure a fair trial. *Id.; Black v. State*, 816 S.W.2d 350, 359 (Tex.Cr.App.1991). An appellate court will not reverse a trial court's denial of a motion to change venue absent an abuse of discretion. *Penry v. State*, 903 S.W.2d 715, 727 (Tex.Cr.App.), *cert. denied*, —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

■ Even if it were possible to select a jury whose members were not challengeable for cause, appellant was entitled to a change of venue if he could show that there were community influences which could affect the answers on voir dire or the testimony of witnesses at trial, or that for any other reason a fair and impartial trial could not be had in Jefferson County. *Henley*, 576 S.W.2d at 72. The mere fact of media attention and publicity do not, however, automatically establish prejudice or require a change of venue; jurors do not have to be totally ignorant of the facts and issues of a particular case. *Teague v. State*, 864 S.W.2d 505, 509 (Tex.Cr.App.1993). Rather, publicity about the case must be pervasive, prejudicial, and inflammatory. *Beets v. State*, 767 S.W.2d 711, 743 (Tex.Cr.App.1987), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579 (1989).

The majority of the news coverage of which appellant complains occurred years before the instant trial. Of the few recent newspaper articles and television newsclips, most merely summarized the history of the case, including that appellant was facing his third capital murder trial after his two prior death sentences had been overturned. The only potentially inflammatory information came from one television station's broadcasts which, in reciting the case's history, stated that one or both of appellant's sentences had been overturned "on a technicality." [20] For the most part, however, the news articles and television broadcasts were accurate and objective and were not inflammatory, pervasive, or prejudicial. We do not agree with appellant that the media attention surrounding his case, viewed as a whole, was inflammatory and prejudicial.

A review of the jury panel questionnaires and of the testimony from those jurors who had knowledge of appellant's case also supports the trial court's ruling. Using the jury selection process to gauge the tenor of the community as a whole, the trial court could have found there was no pervasive public prejudice against appellant.

■ Finally, the testimony at the venue hearing also supports the trial court's ruling. Although appellant presented testimony and affidavits claiming appellant could not receive a fair trial in Jefferson County, such evidence mainly posited that there had been significant media attention regarding the case, and that many people in the community knew appellant had received two death sentences which had been overturned. Knowledge of this sort does not amount to *per se* prejudice against appellant. The State's affidavits and testimony adequately controverted appellant's assertions and countered that publicity surrounding appellant's case had been fair, not inflammatory, and had not fostered any hostile public attitude towards appellant.

In short, the record supports the trial court's finding that appellant could have received a fair trial in Jefferson County. Accordingly, we hold that the trial court was

**20.** Appellant also refers this Court to an editorial cartoon from February 27, 1994. However, this cartoon is not part of the record and cannot be considered in our decision.

within its discretion is denying appellant's motion to change venue. Appellant's twenty-fifth point of error is overruled.

In his twenty-sixth and twenty-seventh points of error, appellant contends that because the original indictment was not included in the appellate record, as per his specific request, Tex.R.App.Proc. 51(b), the record is incomplete and the trial court did not have jurisdiction in this case. Appellant was indicted for this offense in 1974. His 1994 retrial was predicated upon the 1974 indictment. A copy of the 1974 indictment was forwarded to this Court in the transcript, pursuant to Rule 51(a), but not the original, as appellant had requested. In his objection to the appellate record appellant contended he has "an absolute right" to have the original of the indictment forwarded in the transcript for appeal. We observe, however, that Rule 51(a) expressly designates that "copies" of the indictment or information be included in the transcript. In any event, after appellant filed his brief, the original indictment was forwarded to this Court and filed as a supplemental transcript in the appellate record. Appellant presents no substantial basis for us to suspect the indictment has not been in the district clerk's file at all times since its presentment in 1974. Because appellant's arguments hinge upon the absence of the original indictment, the indictment's existence in the record renders them moot, and we overrule appellant's twenty-sixth and twenty-seventh points of error.

### Guilt–Innocence

■ In his first and second points of error, appellant contends that his confession was erroneously admitted into evidence because it was an inadmissible, tainted fruit of both his illegal arrest and an ensuing illegal search and seizure.[21] We will first address his allegation that his statements were an inadmissible fruit of his illegal arrest. Ap-

pellant raised this identical argument in his first appeal of this case, which we resolved against him in *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986). We held that although appellant's warrantless arrest was illegal because there were no exigent circumstances, his confession was properly admissible for Fourth Amendment purposes because it was taken after the taint from his illegal arrest was removed. *Id.* at 786–787, 791–792.

■ Under the doctrine of the law of the case, when a court of last resort has determined questions of law on a prior appeal, those determinations will generally govern a case throughout all of its subsequent stages. *Penry*, 903 S.W.2d at 746–747. As appellant acknowledges, none of the facts surrounding the confession has changed since this Court ruled on the legality of the confession during appellant's first appeal.[22] *Satterwhite v. State*, 858 S.W.2d 412, 430 (Tex.Cr.App.), *cert. denied*, 510 U.S. 970, 114 S.Ct. 455, 126 L.Ed.2d 387 (1993). Moreover, the Court's analysis, which was based on the *Brown* factors regarding attenuation of taint after an illegal warrantless arrest, is still legally valid.[23] *See Banda v. State*, 890 S.W.2d 42, 68 (1994), *cert. denied*, — U.S. —, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995); *Johnson v. State*, 871 S.W.2d 744, 750–751 (1994); *Boyle v. State*, 820 S.W.2d 122, 130–131 (1989), *cert. denied*, 503 U.S. 921, 112 S.Ct. 1297, 117 L.Ed.2d 520 (1992).

■ Appellant argues, however, that as a tainted fruit of an *illegal search and seizure*, his confession was erroneously admitted into evidence at the instant trial. He contends that this Court improperly applied its taint analysis in determining the admissibility of his confession, because we only addressed the ramifications of his illegal arrest and failed to take into account the effects of the allegedly illegal search and seizure. But at

21. Appellant gave two confessions following his arrest. The first confession was held to be inadmissible in *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986), and was not introduced into evidence during the instant trial. Unless otherwise indicated, any reference to appellant's confession is to appellant's second confession, which was admitted into evidence during this trial and is now the subject of this point of error.

22. During the pretrial suppression hearing at his present trial, appellant relied only on those arguments and objections raised during his prior trial and introduced no additional evidence.

23. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

both trials, appellant limited his objections to the issue of his illegal *arrest* only and the effect of that arrest on his confession. Appellant now raises the issue of a possibly illegal search and seizure, for the first time, in his brief on appeal. Appellant has not preserved this claim because he failed to raise it at either trial. *See* Tex.R.App.Proc. 52(a). We overrule appellant's first and second points of error.

■ In his third point of error, appellant argues that the trial court erroneously refused to instruct the jury under Article 38.23, which states:

(a) No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Appellant insists that because sufficient evidence existed to support a jury finding that appellant was illegally arrested, the jury could also have concluded that appellant's confession was "tainted fruit" of his illegal arrest and, therefore, inadmissible under Article 38.23. We disagree. Appellant was entitled to an Article 38.23 instruction only if the trial evidence raised a factual issue concerning whether the evidence was obtained in violation of the federal constitution or the Texas Constitution or any of its laws. *Hamilton v. State,* 831 S.W.2d 326, 331 (Tex.Cr. App.1992). Because there was no dispute regarding the facts surrounding appellant's arrest and confession, he was not entitled to the instruction. *Id.; Thomas v. State,* 723 S.W.2d 696, 707 (Tex.Cr.App.1986) (defendant only entitled to Article 38.23 instruction if there is fact dispute regarding how evidence was obtained). That the taint was sufficiently attenuated from the illegal arrest to allow for the admission of appellant's con-

fession into evidence was a question of law decided by this Court against appellant in his prior appeal. *See* points of error one and two, *ante.* Because there was nothing for the jury to decide regarding the admissibility of his confession, the trial court correctly refused appellant's requested instruction. Appellant's third point of error is overruled.

### Punishment

■ In his fourth point of error, appellant claims that the trial court erroneously allowed the State to characterize his mental retardation as an aggravating factor. Appellant relies on the Supreme Court's decision in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), in support of his contention, but his reliance is misplaced. In *Zant,* the applicable statute assigned aggravating and mitigating labels to particular types of evidence. In Texas, however, the amount of weight each juror might give any particular piece of evidence is left to that juror's own range of judgment and discretion. *Cordova v. State,* 733 S.W.2d 175, 189 (Tex.Cr.App.), *cert. denied,* 487 U.S. 1240, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988). Because what constitutes mitigating evidence is left to each juror's discretion, there is no *per se* mitigating evidence. *Colella, supra,* at 845.

Regarding mental retardation evidence in particular, the Supreme Court noted in *Penry v. Lynaugh,* 492 U.S. at 323–324, 109 S.Ct. at 2949–2950, that it could have a mitigating or aggravating effect. The Court stated, "Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blame-worthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." In addition to *Penry,* we have also cited *Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) for the proposition that "much of the evidence admitted during the punishment phase of a capital trial could potentially be either mitigating or aggravating." *Morrow v. State,* 910 S.W.2d 471, 472 (Tex.Cr.App.1995). Thus, because the jury could have considered appellant's mental retardation evidence as aggravating and/or mitigating, if at all, there was no error in allow-

ing the State to argue the evidence was relevant to appellant's future dangerousness. We overrule appellant's fourth point of error.

■ In point of error five, appellant complains of punishment testimony from Luther Boone, a prison guard who testified on behalf of the State. Boone first testified that in 1981 appellant once threatened to cut the throat of another guard who was conducting a strip search of appellant. Although Boone had not heard appellant threaten anyone else after the incident, he testified that he had seen other death row inmates suddenly snap and become unexpectedly violent after a long periods of good behavior. Appellant objected at trial that Boone's testimony about other death row prisoners was irrelevant.

■ During the punishment phase of a capital murder trial, evidence may be presented on any matter the trial court deems relevant to answering the special issues. *Banda v. State*, 890 S.W.2d 42, 61 (Tex.Cr. App.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995). *See also* Article 37.0711 § 3(a). A trial court's determination of relevancy is not disturbed absent an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Cr.App.1990)(Opinion on rehearing on Court's own motion). Evidence is relevant if it has any tendency to make the existence of any consequential fact more or less probable than it would be without the evidence. Tex. R.Crim.Evid. 401.

■ Although the questioned testimony may not have been very probative, the trial court was within its discretion in ruling that the evidence was at least marginally relevant to appellant's future dangerousness, because it tended to show that appellant could be violent again even after a lengthy period of peaceful behavior. Appellant also argues that the evidence was "highly prejudicial." However, as the State correctly asserts, because appellant did not raise a separate trial objection to the evidence based upon Rule 403, this issue is not properly presented for

our review. *Long v. State*, 823 S.W.2d 259, 271 (Tex.Cr.App.1991), *cert. denied*, 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992); *Montgomery*, 810 S.W.2d at 388. Appellant's fifth point of error is overruled.

■ In his sixth point of error, appellant complains the trial court erroneously allowed police investigator Calise Blanchard, a rebuttal witness for the State at punishment, to testify in violation of "the Rule." *See* Tex. R.Crim.Evid. 613.[24] When the State expressed its intent to call Blanchard to testify as to appellant's mental abilities, appellant objected for the reason that Blanchard had been in the courtroom during appellant's presentation of his punishment evidence, which included detailed testimony about appellant's mental retardation. In response to the trial court's inquiry as to whether Blanchard was "a person whose presence is essential to the presentation of [its case,]" the State offered the following:

> Yes, your Honor, certainly throughout [the] punishment phase. I mean, the defense can talk about what the State has known. The defense has been able to go through the transcripts of both trials of this case. They know what Mr. Blanchard knows.
>
> They know that Mr. Blanchard is not going to testify that he knows Louis Allen or somebody else that's testified for the defense to be an outright liar. He's just going to testify to things he's testified to before in the trial of this cause. He is essential because of the age of this trial— of this case.

The trial court ruled, "Mr. Blanchard will be permitted to testify under Rule 613 but will remain outside the courtroom for the balance of the trial. So, the rule is invoked as to Mr. Blanchard." Defense counsel remarked that the rule had been invoked at the beginning of appellant's trial.

Blanchard was a police investigator who had worked on the case when appellant was arrested for the Chisum murders in 1974. At punishment, Blanchard testified that,

---

**24.** At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order on its own motion. This rule does not authorize exclusion of ... (3) a person whose presence is shown by a party to be essential to the presentation of his cause[.]

based on certain facts surrounding the commission of the crime, he believed the crime was planned. Blanchard further stated that, in his experiences with criminals, he had encountered criminals who were "smart" in crime but not very smart "outside of the criminal element." It was Blanchard's opinion that the person who committed the Chisum murders "had gone to considerable length to prepare to commit this crime" and knew how to "clean it up." Finally, Blanchard testified that, based on appellant's physical condition at the time as well statements in his confession, appellant could have committed the crime alone.

▬ The purpose of placing witnesses in a proceeding under the sequestration rule, as stated in *Cook v. State*, 30 Tex.App. 607, 18 S.W. 412 (1892), is to prevent the testimony of one witness from influencing the testimony of another. Rule 613, which codifies the sequestration rule in the Texas Rules of Criminal evidence, requires a trial judge, at a party's request, to order witnesses excluded from the courtroom during the testimony of other witnesses. However, Rule 613 does not mention what, if any, sanctions a trial court should impose for violations of the rule. *See* Goode, Wellborn & Sharlot, *Texas Practice: Texas Rules of Evidence: Civil and Criminal* § 614.1, at 661 (2d ed.1993). Two possible sanctions a trial court may use are holding a witness who violates the exclusion order in contempt, and the more remedial sanction of refusing to allow the witness to testify. *Id.* Unlike the trial court's obligation to order witnesses excluded during other witnesses' testimony, the court's decision to allow testimony from a witness who has violated the rule is a discretionary matter. "It has been held that the ruling of the trial court on an objection to a witness testifying when he has remained in the courtroom after having been placed under the 'rule' may not be relied upon as a ground for reversal unless an abuse of discretion is shown; and

until the contrary has been shown, it will be presumed on appeal that such discretion was properly exercised." [25] *Valdez v. State*, 776 S.W.2d 162, 170 (Tex.Cr.App.1989), *cert. denied*, 495 U.S. 963, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). In reviewing the trial court's decision to allow the testimony, we look at whether or not the defendant was harmed or prejudiced by the witness's violation; that is, whether or not the witness's *presence* during other testimony resulted in injury to the defendant.[26] Two criteria that have been suggested for determining injury or prejudice in this situation are (a) whether the witness actually conferred with or heard testimony of other witnesses, and (b) whether the witness's testimony contradicted testimony of a witness from the opposing side or corroborated testimony of a witness he had conferred with or heard. *Webb v. State*, 766 S.W.2d 236, 240 (Tex.Cr.App.1989).

In the case at bar, it is clear that Blanchard violated the rule. The trial court had invoked the rule prior to Blanchard's testimony at guilt-innocence, yet Blanchard remained in the courtroom after his testimony during guilt-innocence and, specifically, heard testimony from appellant's punishment witnesses. Contrary to appellant's contentions, however, the *trial court* did not violate the sequestration rule because, in accordance with the language of Rule 613, he ordered Blanchard excluded from the courtroom during the testimony of other witnesses, both at the beginning of trial and when appellant specifically objected to Blanchard's punishment testimony. Although Blanchard violated the rule when he remained in the courtroom and listened to other testimony, the decision to allow Blanchard to testify at punishment was within the trial court's discretion.

Although Blanchard's testimony could potentially have been affected by having heard testimony from appellant's punishment witnesses, Blanchard's testimony and opinions

---

**25.** For a review of a trial court's decision to *disallow* testimony from a criminal defendant's witness who has violated Rule 613, *see Webb v. State*, 766 S.W.2d 236 (Tex.Cr.App.1989).

**26.** If it is determined that a trial court abused its discretion in allowing the testimony, then there

is trial error subject to a harmless error analysis under Tex.R.App.Proc. 81(b)(2). Such error is reversible unless the allowed *testimony* from the offending witness, as opposed to the witness's *presence* during other witnesses' testimony, was harmless beyond a reasonable doubt.

clearly were based upon his own experiences and investigations in the instant case, as well as on his experiences as a police investigator in general. Blanchard's opinions were not based upon any testimony from appellant's witnesses at punishment, nor did they contradict any testimony that appellant was mentally retarded, as appellant suggests. There is no evidence that the testimony Blanchard heard influenced his own testimony. In other words, Blanchard's presence in the courtroom during testimony from appellant's punishment witnesses did not color his own testimony. The trial court did not abuse its discretion in permitting Blanchard to testify. Because we do not find trial error in the court's decision to allow the testimony, we overrule appellant's sixth point of error.

▪ In point of error seven, appellant argues that his death sentence violates the federal constitutional guarantee of equal protection and prohibition against cruel and unusual punishment because the death penalty in Texas is administered in a racially discriminatory manner. As appellant acknowledges, the Supreme Court rejected similar arguments from a Georgia defendant in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). In that case, McCleskey relied on a statistical study purporting to show that African American defendants like himself have a slightly greater likelihood of receiving the death penalty than white defendants, and that defendants in general who are accused of killing white victims, as in McCleskey's case, have a significantly greater chance of receiving the death penalty than defendants charged with killing black victims. Regarding McCleskey's equal protection claim, the court held that in order to prevail, McCleskey needed to prove that the decision makers in *his* case acted with a discriminatory purpose. *Id.* at 292, 107 S.Ct. at 1767. The Court disagreed with McCleskey's contention that the study alone constituted sufficient proof of purposeful discrimination in his case. *Id.* at 297, 107 S.Ct. at 1770.

Like McCleskey, appellant relies solely on studies suggesting disparities in sentencing due to the race of the victim and defendant and only adds references to Texas studies allegedly showing results similar to those from the Georgia study. Appellant fails to demonstrate how the Texas studies change the Supreme Court's analysis, nor does he suggest that these studies indicate discriminatory intent in his case any better than the Georgia studies indicated such intent in McCleskey's case. Appellant's reliance on these studies is insufficient to support any inference that any of the decision makers in his case acted with discriminatory intent. *See id.* at 297, 107 S.Ct. at 1770. Because appellant fails to direct us to any proof of purposeful prosecutorial or jury discrimination in his particular case, his equal protection claim, too, must fail. *County v. State*, 812 S.W.2d 303, 308 (Tex.Cr.App.1989).

▪ Appellant also raises the argument that the application of our death penalty scheme in a racially discriminatory manner violates the Eighth Amendment's protection against cruel and unusual punishment. In *McCleskey*, the Supreme Court held that evidence indicating sentencing discrepancies appearing to correlate with race did not demonstrate either that McCleskey's sentence was disproportionate, or that a constitutionally significant risk of racial bias affected Georgia's capital sentencing process. *Id.* at 308–309, 313, 107 S.Ct. at 1776, 1778. Again, appellant relies on McCleksey's arguments and only adds allusions to similar studies based on the Texas death penalty. This Court rejected a similar claim in *Robinson v. State*, 851 S.W.2d 216, 232 (Tex.Cr.App.1991), *cert. denied*, 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994).

Appellant does contend that *McCleskey* is distinguishable from his situation, however, because Georgia's sentencing scheme differs from that of Texas. Appellant points to "the pivotal role that the 'future dangerousness' special issue has played in the capital sentencing determination in Texas in the post-*Furman* era" and asserts that the future dangerousness special issue is "inherently racially biased" because white jurors are more likely to perceive African Americans as future threats to society. Appellant provides no relevant support for his contention other than a Michigan law review article and a single instance of individual juror prejudice

in one Texas case. Because appellant has not convinced us to veer from the Supreme Court's holding in *McCleskey, supra,* and because he does not ask this Court to interpret the Texas Constitution to provide greater protection, we overrule his seventh point of error.

■ In his twelfth point of error, appellant contends that the Fourteenth Amendment's Due Process clause requires a comparative proportionality review of death penalty verdicts to determine whether a particular death sentence is excessive or disproportionate as compared to other death sentences in other capital murder cases.[27] Appellant bases his claims exclusively on the United States Supreme Court's holding in *Honda Motor Company, Ltd. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), that an amendment to the Oregon constitution, which effectively prohibited any judicial review of the size of punitive damage awards in civil cases, violated due process. The Court grounded its holding in common law existing at the time the Fourteenth Amendment's enactment which contemplated appellate review of the amount of punitive damages. *Id.,* 512 U.S. at 419–426, 114 S.Ct. at 2335–2338. The common law requirement raised a presumption that a lack of appellate review of punitive damages for excessiveness violates due process, and that the presumption could only be overcome by some alternative state law mechanism adequate to protect against the danger of jury overreaching. *Id.,* at 430, 114 S.Ct. at 2339. Because Oregon had no alternative safeguards, the Court held that due process required some form of appellate review. *Id.,* at 432–33, 114 S.Ct. at 2341. The Court did not, however, specify what form of appellate review was required, even in

the context of jury awarded punitive damages. Contrary to appellant's contention, we cannot interpret *Honda* to support the argument that due process specifically requires a comparative proportionality review of jury verdicts in capital murder cases when the death penalty is imposed.[28]

Moreover, appellant's analogy between *Honda*'s holding regarding jury awarded punitive damages and a jury's capital sentencing decisions is unsupported. Because appellant relies solely on *Honda,* he necessarily must follow the Court's reliance on the common law existing at the time the Due Process clause was enacted. However, appellant presents no caselaw or argument to support the proposition that when the Fourteenth Amendment was promulgated, the common law required every capital sentence to be measured on appeal against all other death sentences. Appellant fails to raise a presumption that without a comparative proportionality analysis, appellate review of capital sentences in Texas violates due process. Appellant's twelfth point of error is overruled.

■ Point thirteen voices appellant's contention that it would violate the Eighth Amendment's prohibition against cruel and unusual punishment to execute appellant after he has spent "over two decades" on death row and after he has had "many"[29] execution dates scheduled. In his brief, appellant cites various authorities who have discussed the torturous and cruel effects of a lengthy stay on death row. With respect to his own suffering, appellant asserts that "[a]s a result of the abhorrent conditions to which he has been subjected during the last seventeen-and-a-half years, Appellant endured a needlessly *lingering* form of torturous psychological punishment."

27. In addition to advocating a "comparative proportionality review" comparing death sentences in different capital murder cases, appellant also reurges his contention that this Court should engage in a "proportionality review" by weighing aggravating evidence against mitigating evidence in each particular case. *See* point of error nine, *ante,* and n. 11, *ante.*

28. We note that our capital sentencing scheme in Texas currently includes appellate review for rationality of the jury's verdicts regarding guilt-

innocence and the "future dangerousness" special issue at punishment.

29. Appellant suggests that this Court "can take judicial notice that at least seven execution dates have been scheduled and later stayed." However, appellant does not point to any place in the record that reflects this information. We decline to take judicial notice of these execution dates and do not include them in our determination of his point of error.

■ The State responds that appellant has not preserved this issue for appellate review because he failed to raise it at trial and failed to include any facts in the record that pertain to his claim. It is true that appellant has not established a record supporting his claim of "lingering psychological anguish." If anything, the evidence he presented at punishment to show that during his years on death row he had become a peaceful, religious, trustworthy, and industrious model prisoner, seems to contradict his current claim. Because appellant's assertions of personal suffering are not supported by evidence in the record, we will not consider them. *Franklin v. State*, 693 S.W.2d 420, 431 (Tex.Cr.App.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986) (mere assertions in a brief not supported by evidence in the record will not be considered on appeal).

■ Furthermore, appellant does not allege that any delays in his case have been due to State tactics designed to prolong his wait and thereby increase his suffering. In fact, any delays have resulted from appellant's legitimate entitlement to the benefits of appellate review of his death sentence. The existence of delays in appellant's case have arguably been necessary to ensure that his conviction and sentence are proper and not inhumane. Although the federal constitution protects citizens against State abuses, it does not and cannot protect them against those costs which are necessary and inherent in the exercise of the rights it guarantees. *See Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422, 426–427 (1947) ("The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely.") Unless appellant demonstrates to the contrary, we will view any time passage during the appellate process as necessary and will not hold any delays against either appellant or the State.

Appellant bases his claims on the approximately twenty years that have elapsed since he was arrested for the murders in 1974. Although he acknowledges that prior to his first conviction for Ferd Chisum's murder in 1982, he was in prison for the murder of Irene Chisum, he contends that the entire time he has been in prison since 1974 should "count" because he has been on death row for a single criminal transaction. The history of appellant's case, with its multiple prosecutions and trials, illustrates the extreme difficulty of counting and determining a threshold number of years that would *per se* prevent imposition of the death penalty.

If this Court were to hold that executing an inmate after a threshold amount of time on death row would *per se* violate the Eighth Amendment, such a holding would undoubtedly encourage inmates to delay their appeals as much as possible. Even assuming the torturous effects of appellate delay, the hope of a life sentence coupled with the torturous anxiety of waiting would arguably be preferable to a certain death. We refuse to encourage inmates to prolong their appeals on hope that they could receive a life sentence if they keep their appeals alive for a certain number of years. The arbitrary results that would follow such tactics, as well as the difficulties in discerning a threshold period of time, compound the problematic nature of appellant's claim. We decline to hold that, because of appellant's years spent awaiting his execution, his execution would violate the Eighth Amendment's ban against cruel and unusual punishment. *See McKenzie v. Day*, 57 F.3d 1493 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 1840, 131 L.Ed.2d 846 (1995); *Fearance v. Scott*, 56 F.3d 633 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2603, 132 L.Ed.2d 847 (1995); *Turner v. Jabe*, 58 F.3d 924 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2019, 131 L.Ed.2d 1017 (1995). Appellant's thirteenth point of error is overruled.

■ In his fourteenth and sixteenth points of error, appellant urges that the administration of the death penalty in Texas violates the Eighth Amendment's prohibition against cruel and unusual punishment. In support of his contention, appellant relies on Justice Blackmun's dissenting opinion in *Callins v. Collins*, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), in which Justice Blackmun concluded that competing federal

constitutional requirements of "structured discretion," as stated in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and freedom to consider mitigating evidence, as expressed in *Penry v. Lynaugh*, *supra*, are ultimately irreconcilable. Appellant further complains that Texas's mitigation special issue unconstitutionally "permits the very type of open-ended discretion condemned by the Supreme Court in *Furman*." We have resolved this issue against appellant and have held that our statute properly narrows the eligibility decision during the guilt phase while permitting the jury at punishment the ability to determine a defendant's culpability. *Lawton*, 913 S.W.2d at 558. Contrary to appellant's contention, the federal constitution's requirement of definiteness in setting the parameters of death eligibility is not applicable to provisions allowing the jury to consider and give effect to mitigating evidence. *Id.* *See also McFarland, supra,* at 521. Rather, *Furman* concerns the untrammeled discretion to impose the death penalty, not the decision that circumstances exist which mitigate against the imposition of the death penalty. *Id.* at 558, 560. *See also Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976); *Tuilaepa v. California*, 512 U.S. 967, 972–73, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750, 761–762 (1994). Our broad selection determination, which allows individualized sentencing and accommodates relevant mitigating evidence, does not violate the Eighth Amendment. *McFarland*, at 520. Appellant's fourteenth and sixteenth points of error are overruled.

In point of error fifteen, appellant argues that the death penalty in Texas has been arbitrarily imposed and is unconstitutional because of the different capital sentencing schemes that have been in effect since 1989. We addressed this identical argument in *Lawton*, 913 S.W.2d at 559–60. Appellant raises no novel argument to persuade us to revisit this holding. Therefore, we overrule his fifteenth point of error.

Appellant argues in point seventeen that the statutory definition of mitigating evidence is facially unconstitutional because it limits jury consideration to factors that render a defendant less morally blameworthy for commission of the offense. Appellant asserts that mitigating evidence should also encompass "evidence relevant to a defendant's character, history, or circumstances of the crime that militates in favor of a life sentence."

Like its counterpart in Article 37.071 § 2(e), Article 37.0711 § 3(e) directs the jury, after answering the first two special issues, to determine

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Article 37.0711 § 3(f)(3) further provides that in answering the mitigation special issue, the jury shall be charged that it "shall consider mitigating evidence that a juror might regard as reducing the defendant's moral blameworthiness." We have held that these definitions singularly or in combination do not conflict with the United States Constitution. *Lawton*, 913 S.W.2d at 555. *See also Penry v. Lynaugh*, 492 U.S. at 319, 109 S.Ct. at 2947 (suggesting punishment should be directly related to the defendant's personal culpability). Because appellant raises no new arguments in support of his claim, we overrule his seventeenth point of error.

In points of error eighteen and nineteen, appellant contends that the admission of unadjudicated extraneous offenses at punishment violated Article 37.07 § 3(a) and the Eighth and Fourteenth Amendments to the United States Constitution. Although appellant asserts he raised this claim at trial, his trial motion only requested the jurors to be instructed that they "must find unadjudicated offenses to have been proven beyond a reasonable doubt before they may consider such evidence in answering the special issues." An objection stating one legal basis may not be used to support a different legal theory on appeal. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Cr.App.1990). Furthermore, appellant did not voice his current objection when the complained of evidence was intro-

duced at trial. *See* Tex.R.App.Proc. 52(a). Because appellant has presented nothing for our review, we overrule points eighteen and nineteen.[30]

■ In his twentieth point of error, appellant alleges the death penalty in Texas is arbitrarily applied and violates the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, appellant alleges that counties with large tax bases, such as Jefferson County, are able to seek the death penalty more frequently than smaller or rural counties, who "are unable to seek the death penalty in any case, no matter how worthy the prosecutor may believe that a particular capital defendant is for capital punishment," or in medium-sized counties, who often "are able to seek the death penalty in only a tiny fraction of eligible capital cases because of financial restraints." Appellant complains that if he had committed his offense in another Texas county, his chances of escaping the death penalty would have been greater than they were in Jefferson County. Aside from these generalizations, appellant presents us with nothing to support his allegations, and we decline to follow appellant's suggestion that we take judicial notice of his broad assertions of "fact." Because appellant provides no empirical data, caselaw, or other factual basis to support his claim, there is no foundation upon which we can make a determination regarding the merits of his claim. Therefore, we overrule appellant's twentieth point of error.[31]

■ In his twenty-first point of error, appellant contends that his execution would violate the Eighth Amendment's ban against cruel and unusual punishment because he was mentally retarded at the time of the offense. He argues that because ten states have passed legislation banning execution of mentally retarded individuals, there is a growing "national consensus" against such executions. Appellant does not discuss any of these statutes and points to no relevant caselaw from Texas or from other states.

As appellant acknowledges, the United States Supreme Court in *Penry v. Lynaugh*, 492 U.S. at 335–38, 109 S.Ct. at 2955–57, held that the Eighth Amendment does not preclude execution of mentally retarded persons. "So long as sentencers can consider and give effect to mitigating evidence," the Court explained, "an individualized determination of whether 'death is the appropriate punishment' can be made in each particular case." *Id.* Although appellant introduced a great deal of mental retardation evidence at his trial, the jury chose not to give it sufficient weight to mitigate against imposition of the death penalty.

This Court addressed appellant's claim in *Penry v. State, supra,* and held that because the jury was able to give mitigating weight to Penry's mental retardation evidence, his death sentence did not violate the Eighth Amendment. 903 S.W.2d at 766–767. Likewise, we hold that appellant's sentence does not violate the Eighth Amendment and overrule appellant's twenty-first point of error.

■ In point of error twenty-two, appellant complains of testimony from the Chisums' two daughters during the punishment phase of his trial. He contends that their "victim impact statements" to the jury were irrelevant to any of the punishment special issues and were highly prejudicial. Specifically, appellant refers to testimony from one daughter that the murders of her parents led to medical problems and her divorce, and caused her relationship with her sister to grow apart. He also points to testimony from the second daughter that the murders caused her to lose her faith. The State argues that appellant did not preserve this point for review; alternatively, it asserts that the trial court properly deemed the sisters' testimony to be relevant to the punishment special issues.

The record reflects that although appellant repeatedly and successfully objected to questions concerning the character of the deceased victim, he did not object to the specif-

---

**30.** We observe that even if appellant had properly preserved these two points of error, they are without merit. *Lawton,* 913 S.W.2d at 560.

**31.** We note that the Capital Litigation section of the Texas Attorney General's office exists especially to aid smaller counties in prosecuting capital cases.

ic testimony of which he now complains on appeal. In contrast to his many objections to victim character evidence, appellant objected once to the daughters' victim impact testimony on relevance grounds when one of the daughters was asked what went through her mind every anniversary of the murders.[32] However, after his objection was overruled, appellant raised no further objections to victim impact testimony, nor did he ask for a running objection to such testimony. Appellant did not properly preserve this issue for appellate review. Tex.R.App.Proc. 52(a). Therefore, we overrule appellant's twenty-second point of error.

 In his twenty-third and twenty-fourth points of error, appellant alleges that because the jury deadlocked during punishment deliberations, the trial court erred by instructing the jury to continue deliberating instead of sentencing him to life imprisonment in accordance with Article 37.0711 § 3(g).[33] According to the record, after the jury had deliberated for about five hours and forty minutes, the foreperson sent a note to the trial judge requesting instructions, after stating that the vote on the second special issue, regarding future dangerousness, was eleven to one with "[n]o movement." The trial court answered, "Thank you for the information you have supplied. Under the law I must instruct you to continue your deliberations." Appellant objected to this instruction and argued that because the jury was deadlocked, the trial court must impose a life sentence. The trial court replied:

If I was confronted with the situation contemplated by 37.0711, I would do what you said. But the jury has not reported that it is deadlocked. It just reports the score at the present time. So, I think it's appropriate to tell them to continue their deliberations.

If they continue in the [sic] status, then further consideration will be given to what you were asking for. But at this time I

don't think it's proper. So, it's overruled and denied.

Four hours later, the jury sent a second note to the trial judge saying, "The vote is split 11 to 1 on issue number three [the mitigation special issue] along the same lines. Instruction requested." Appellant again objected, and the trial court again instructed the jury to continue deliberating. One hour and five minutes later, the jury announced its verdict, in which it answered the first two special issues "yes" and the third "no."

 The length of time the jury may be held for deliberation rests in the sound discretion of the trial judge, who will not be reversed on appeal absent a showing by appellant that discretion was abused. *Green v. State*, 840 S.W.2d 394, 407 (Tex.Cr.App.1992), *cert. denied*, 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). In *Green*, we held that a trial judge did not abuse its discretion by ordering a jury to continue deliberations when, after six and one-half hours, the jury sent a note informing the judge that they could not unanimously agree on any of the special issues. *Id.* We noted that six and one-half hours of deliberations was clearly not excessive, given the serious nature of the potential sentence involved, and considering that the jury had to review five full days' worth of evidence from the guilt-innocence and punishment phases, including testimony from twenty-six witnesses. In the case at bar, punishment evidence alone encompassed more than four days of testimony from fourteen witnesses. We hold that requiring the jury to deliberate further, after five hours and forty minutes and then after another four hours, was not an abuse of discretion.

 Furthermore, contrary to appellant's suggestion that each charge was an improper "dynamite charge," the trial judge's charges in the case at bar were not coercive, in that they only directed the jury to continue deliberating and did not indicate that the disagreeing juror should defer to the opinion of the majority, or did not otherwise pressure

---

**32.** Appellant does not complain about this particular testimony on appeal.

**33.** If the jury ... is unable to answer any issue submitted under Subsection (b) or (e) of this

section, the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life.

the jurors into reaching a verdict. *Montoya v. State,* 810 S.W.2d 160, 166–167 (Tex.Cr. App.1989), *cert. denied,* 502 U.S. 961, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991). Appellant's twenty-third and twenty-fourth points of error are overruled.

Finding no reversible error, we affirm the judgment of the trial court.

BAIRD, J., concurring.

I disagree with the majority's treatment of appellant's points of error nine, ten and eleven for the reasons stated in *Morris v. State,* 940 S.W.2d 610 (Tex.Cr.App.1996) (Baird, J., dissenting). I concur in the disposition of the fifteenth point of error for the reasons stated in *Green v. State,* 912 S.W.2d 189, 196 (Tex.Cr.App.1995) (Baird and Overstreet, JJ., concurring). Accordingly, I join only the judgment of the Court.

OVERSTREET, J., concurs.